# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| KAREN M. HUFFAKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:05-CV-527 |
| ) | (Phillips/Guyton) |
| METROPOLITAN LIFE INSURANCE ) | |
| COMPANY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This civil action is brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001 *et seq.*, and is before the Court for consideration of defendants' motion for judgment as a matter of law [Doc. 18]; plaintiff's motion for judgment on the pleadings [Doc. 25]; and defendants' cross motion for judgment on the pleadings [Doc. 28]. Responses and replies have been received. For the reasons that follow, defendants' motion for judgment as a matter of law [Doc. 18] is **GRANTED**; plaintiff's motion for judgment on the pleadings [Doc. 25] is **DENIED**; and defendants' cross motion for judgment on the pleadings [Doc. 28] is **GRANTED**.

### I. Administrative record

Plaintiff Karen M. Huffaker ("Huffaker") worked for Campbell Soup Company as a

1

store manager in a Pepperidge Farm Thrift Store until January of 2004. The Campbell Soup Company maintains a long-term disability benefits plan for its employees (the "Plan"). Metropolitan Life Insurance Company ("MetLife") is the claim administrator of the Plan. Under the Plan, in order for an individual to be considered "disabled" for the first 24 months after the sixth month Elimination Period, he or she must receive, due to a sickness, pregnancy, or accidental injury, appropriate care and treatment from a doctor on a continuing basis, be unable to perform each of the material duties of his or her occupation, and be unable to earn 80% of the predisability income at the claimant's own occupation. After benefits under the Plan have been paid for the first 24 months, to be considered "disabled," a claimant must be unable to earn more than 80% of his or her predisability income from any employer in the claimant's local economy at any gainful occupation for which the claimant is reasonably qualified taking into account the claimant's education, training, experience, and predisability earnings.

On January 2, 2004, Huffaker sustained a rib fracture due to coughing. On January 21, 2004, she applied for short-term disability benefits. Treating physician, Dr. William Fry, noted that, although Huffaker was capable of working an eight hour work day, she was unable to perform heavy lifting. Huffaker's employer would not allow her to return to work with this restriction. The following week, Huffaker would be released to full duty with no work restriction. Nevertheless, MetLife approved short-term disability benefits for Huffaker with beginning date of January 3, 2004.

In February of 2004, Huffaker aggravated her rib injury and, at that time, the co-

practitioner of Dr. Fry, Dr. Charles Bozeman, submitted an attending physician statement indicating a primary diagnosis of a fractured rib and secondary diagnoses of bronchitis and fibromyalgia. Dr. Bozeman stated that Huffaker was "able to perform most of her job part of the time;" that she was still recovering from her rib injury; and that Huffaker would be reevaluated in four to five weeks. On March 24, 2004, Dr. Bozeman submitted a treatment note indicating a worsened condition, stating that "[t]here is really hardly any place that she doesn't hurt;" that she was tender over her shoulders, arms, chest wall, abdomen, calves, thighs, and feet; and that Huffaker had fibromyalgia, hyperlipidemia, arthritis, myalgias, and an elevated level of CPK (an enzyme that can be suggestive of a variety of muscle disorders). Dr. Bozeman's treatment notes thereafter essentially are consistent in Huffaker's diagnosis of fibromyalgia and/or myfascial pain syndrome.

Huffaker was also evaluated by a neurologist, Dr. Darrell Thomas. Dr. Thomas noted Huffaker's complaints of pain, but noted normal results to physical testing. For example, Dr. Thomas found Huffaker's reflexes to be normal and symmetric in all four extremities. He found her gait and station to be normal. It appears that the parties dispute whether Dr. Thomas actually diagnosed Huffaker with fibromyalgia. However, in a submitted medical opinion form dated June 12, 2004, Dr. Thomas reported that plaintiff suffered moderately severe pain and that Huffaker would have reasonable medical necessity to be absent from work on a chronic basis. Further, Dr. Thomas believed plaintiff could sit for four hours in an eight hour work day, one hour at a time and could stand or walk for one hour per day, ten minutes at a time. He also stated that Huffaker could lift up to 5 pounds occasionally and up to 20 pounds infrequently.

3

At Dr. Bozeman's request, Huffaker was also seen on April 22, 2004 by a physical medical and rehabilitation doctor, Dr. Lisa Bellner, who found that Huffaker had generalized muscle pain. In particular, Dr. Bellner stated that "Ms. Huffaker has a constellation of symptoms not clearly identified. They are not entirely consistent with a diagnosis of fibromyalgia and the elevated CPK is suspicious for an underlying myopathic or metabolic process ...."

On May 6, 2004, Dr. Marcin Gornisiewicz, a rheumatologist, conducted an "exam [which] disclosed no evidence of inflammatory arthropathy and no evidence of neurological focal or motor deficits. The doctor noted that there were "a few tender points that suggest a myofasical component of her symptoms." As to his impression, Dr. Gornisiewicz believed that the most likely diagnosis would be fibromyalgia or chronic fatigue syndrome; however, he did not actually diagnose the plaintiff with any of these conditions. He stated that he would like to obtain additional records and additional laboratory tests to make sure that he is not missing any type of systemic involvement. Later, Dr. Gornisiewicz stated in a medical note that he felt that Huffaker did have fibromyalgia.

On April 1, 2004 and April 16, 2004, cardiologist, Dr. Roger Reidel, examined Huffaker. He stated as follows: "I am actually not sure what is going on with this lady. It seems like it is a little more than fibromyalgia. It should not cause abnormal CPK levels. I agree that she has some of the features of fibromyalgia, but boy I think she really does need a full evaluation by a rheumatolgy and neurolgy [sic] to see if we are not missing something." A later complete cardiac work-up revealed normal findings. Medical records

4

from Dr. Bozeman's office dated April 26, 2004 state that Dr. Riedel "had encouraged her to discontinue her medicine ...."

On June 1, 2004, MetLife arranged for a review of Huffaker's file by Dr. Tracy Schmidt, a physician board certified in internal medicine and rheumatolgy. Dr. Schmidt recommended considering a physical functional capacity impairment to Huffaker's own occupation until such time as updated neurology records from Dr. Thomas and certain testing results could be obtained. MetLife extended the claim in accordance with Dr. Schmidt's recommendation.

Additional medical documentation from Dr. Thomas reflected "continued muscle cramping, etiology unknown." Testing with respect to muscle biopsy, blood chemistries, urinalysis, nerve condition studies, and studies of muscle electrical signals were all normal. Further, the physical examination, including motor strength, reflexes, gait and station, of Huffaker were all normal with the exception of decreased vibratory response in the lower extremities. Dr. Bellner submitted MRI results, which noted some disc bulging and degenerative changes. In records dated May 24, 2005, Dr. Bellner repeated her impression of "generalized body pain," remarking that the etiology was unclear. Dr. Bellner felt that no further radiology studies were necessary. Likewise, Dr. Reidel recommended no further cardiac evaluation were needed. Dr. Reidel commented as follows: "I am certainly not sure what exactly is causing all her ills .... It certainly fits along the line of fibromyalgia and chronic fatigue syndrom with some type of mood disorder." Dr. Bozeman repeated his opinion that Huffaker's pain and aliments were due to fibromyalgia. Further,

5

it appears that many of the Huffaker's physicians thereafter began listing fibromyalgia in their treatment and assessment notes.

MetLife extended Huffaker's short-term disability benefits to July 9, 2004. Huffaker submitted a long-term disability claim, complaining of chronic pain. With the claim, Dr. Bozeman submitted an attending physician statement, diagnosing Huffaker with fibromyalgia and myofascial pain, as well as stating that Huffaker could only work one hour per day and that she had severe limitations in psychological functioning.

In response, on July 6, 2004, MetLife referred the matter to Dr. Schmidt for review. Dr. Schmidt recommended an independent medical examination by a rheumatologist. MetLife extended the claim by letter dated August 18, 2004, noting that continued benefits were dependant upon the outcome of the independent medical examination. Huffaker submitted notes of a "new patient consultation" with Dr. Kenny Sizemore, dated September 10, 2004. He felt that Huffaker's condition was "probable fibromyalgia" and stated that Huffaker was "so tender diffusely, I think even control points are positive." He also felt that it was impossible to determine accurately whether the patient was seeking "secondary gain." Dr. Sizemore thought that Huffaker could improve and encouraged her to follow up with psychiatrist help, in needed.

On October 7, 2004, Huffaker underwent an independent medical examination with Dr. Jeffrey Uzzle, a doctor in orthopedic medicine. Dr. Uzzle reviewed other physicians' records, the job description of the store manager, letters regarding her aquatics program,

a radiology report from MRI studies, laboratory reports, handwritten notes from unspecified sources, and some notes that were apparently prepared by Huffaker. As to specific findings, Dr. Uzzle found that Huffaker had a normal posture and spinal alignment with standing; a normal gait pattern; normal heel to toe walking without evidence of weakness or spasticity; normal range of cervical motion in all directions without complaints; no muscle spasms of the neck; her thoracic and lumbosacral flexion, extension, bilateral side bending, and rotation were normal without pain; her reflexes were normal; and her muscle strength was "5 out of 5" in both the upper and lower extremities. With the exception of subjective numbness over the tops of the feet, Huffaker's sensation was normal in the upper and lower extremities. She also had a normal active range of motion in the extremities, with no joint instability, swelling, edema, or atrophy. Dr. Uzzle also noted that she had normal finger-to-nose and heel-to-shin coordination testing in all four limbs.

In reviewing and considering Huffaker's medical records, Dr. Uzzle noted that "she has been thoroughly evaluated from the standpoint of multiple different specialties and in the end there has been no specific objective and verifiable anatomic problem to explain her varied symptomatology." Dr. Uzzle characterized Huffaker's case as a "diagnostic dilemma" and expressed concern that her pain disorder was largely psychologically based. In summation, he stated:

> It is not clear to me why she stopped working in early March of 2004. I find no objective basis why she cannot return to her work as a thrift store outlet manager at this point assuming she is psychologically capable of doing this. A FCE [functional capacities evaluation] may be helpful to document her functional abilities; that is of course assuming that psychological features do not interfere with her ability to perform well on an FCE. I have doubts that she

7

would perform well on an FCE and have doubts that a valid FCE would be obtained because of this.

As to this independent medical evaluation, Huffaker contests its validity, as well as the administrator's reliance upon it. Huffaker directly questions the veracity and thoroughness of Dr. Uzzle's examination. In a report to MetLife, she states:

> the only thing the evaluation consisted of was sitting in the waiting room and filling out a questionnaire for 1½ hours. When I was called back to a room I was told to put on these throwaway pants and shirt. His report states I had a normal blood pressure at 120/80. I've not run a normal 120/80 blood pressure as far back as I can remember. They didn't even take my blood pressure. After about 40 mins. [sic] Dr. Uzzle came into the room and sit [sic] down at a small desk. I handed him some medical records and x rays I had brought with me from the chair I was sitting in then I sit [sic] upon the exam table. He sit [sic] at the desk and went through the folder of records that he had brought into the room with him tore a lot of them out and through [sic] a lot of them in the garbage can. Then Dr. Uzzle ask [sic] me where I had pain and while I was trying to explain he told me to get up and walk on my tip toes which I couldn't because I have no balance. Then he told me to walk on my heels which I couldn't because I had no balance. He told me to touch my finger to my nose them he told me to touch my finger to my nose with my eyes closed. He did not examine my body at all other than what's stated above.

An internal record from January 28, 2005 shows that the case manager received a call from the Human Resources department asking if there was any way to assist Huffaker regarding the IME report. However, MetLife did not investigate Huffaker's allegations.

Around the time of Dr. Uzzle's examination of Huffaker, Huffaker was denied Social Security disability benefits by letter dated October 20, 2004. The Social Security Administration explained that, although Huffaker had shoulder, arm, and back pain, the evidence showed that she could move about and use her extremities in a satisfactory

8

fashion.[1] MetLife terminated Huffaker's claim on December 22, 2004, citing the findings of Dr. Uzzle, MetLife determined that "[t]here is no medical evidence provided by the treating sources to suggest a significant functional impairment or support the severity of this medical condition to prevent [her] from performing [her] job."

Huffaker filed her appeal on December 27, 2004. In support of her appeal, Huffaker submitted three treatment notes from Dr. Jeff Greenwood. Dr. Greenwood's notes indicate that Huffaker complained of depression and that he had prescribed the drug Cymbalta. Dr. Greenwood's records did not reflect any assignment of any cognitive or other functional limitation to her condition. Dr. Bozeman also submitted an updated attending physician statement with treatment notes, now opining that Huffaker could work a total of zero hours per day on account of fibromyalgia and chronic myofascial pain syndrome. Dr. Bozeman's treatment notes reflect that Huffaker "says she could consider trying [to work] so we wrote a note to go back to work 3 hours a day for 3 days a week for the next 3 weeks and she is to F/U to see if she can increase her hours at work if this is successful." Huffaker never went back to work.

Also, Huffaker submitted a letter dated January 14, 2005 from her physical therapist, Anita Ferris, who found that Huffaker tested positive for pain at 16 of 18 tender point sites, consistent with a diagnosis of fibromyalgia. According to Ms. Ferris, Huffaker was unable

---

[1] A treatment note of Dr. Bozeman dated October 8, 2004 alluded to the denial of Huffaker's social security disability claim. Huffaker stated that another rheumatologist, Dr. Gee, examined her and that "he didn't believe in disability from fibromyalgia" and that she was upset that "he could not find her trigger points."

to tolerate sitting, standing, or walking for more than 20-30 minutes at a time, and could not perform lifting, twisting, bending, and overhead repetitive upper extremity activity.

Ms. Ferris also submitted a medical opinion form in which she rated Huffaker's pain as severe and believed that she could not reasonably be expected to attend a 40 hour work week. Ms. Ferris felt that Huffaker could sit for 1-2 hours in an eight hour work day, 10-30 minutes at a time, and walk 1-2 hours per day, .07 miles at a time. She also stated that Huffaker could lift up to a maximum of 5 pounds infrequently, and would require 1-3 hours of bed rest per day. She also articulated that Huffaker suffers daily lapses of concentration.

MetLife sent Huffaker's medical file to two physicians for independent file reviews. After consideration of Huffaker's medical records, Dr. Annette DeSantis, a physical medicine and rehabilitation specialist, wrote:

> The question regarding available medical documentation to substantiate functional limitations that would preclude the ability to perform the material duties of this employee's medium exertional level job as of December 23, 2004 is that there is none. She has had extensive testing done, much of which was negative. She has had some mildly positive tests. At one point she had an elevated CPK, but this has normalized. She has had very, very mild rheumatologic testing, which would basically be considered upper limits of normal. She has had no findings on her imaging studies to suggest significant abnormality other than some mild arthritis. Muscle pathology has been ruled out with a biopsy and with an EMG. She does have complaints of chronic pain. She is described as having depression. I cannot offer my opinion regarding whether she is disabled in terms of her psychological status. She is also on multiple medications, which can interact and interfere with her ability to perform, and also which do not seem to be enhancing her life. In terms of actual physical medical condition that would keep her from being able to physically perform her job, I cannot identify one.

After review of Huffaker's medical records, Dr. Edward Ewald, a rheumatologist, found:

> All of these notes document that there is no evidence of any active synovitis. Also the physician notes do not document any muscle weakness and they state her strength is normal. There is no documentation of any substantial limitation of motion of her joints. There is no documentation of any swelling of her joints or muscles. There is a letter from Dr. Bozeman to Social Security Disability, which comments on swollen muscles although this is not documented in any of his physical examination reports in the actual medical records. The findings described in these reports are consistent with but not diagnostic of fibromyalgia since this is basically a diagnosis of exclusion. I find no objective evidence in any of these records to substantiate functional limitations that would preclude her ability to perform in material duties of her medium exertion level job. However, it is clear that she does have persistent subjective complaints of muscle pains and joint pains.

Ultimately, MetLife denied Huffaker's appeal upholding its determination to terminate benefits and notified Huffaker by letter dated February 10, 2005, citing to the findings of Huffaker's physicians and the independent medical reviewers. Thereafter, Huffaker hired an attorney, who sought to submit several hundred pages of additional information for consideration. MetLife advised that it would not accept and/or consider the supplement in that MetLife had already issued a final decision. Huffaker then filed this action before the undersigned.

## II.   Standard of review

In the subject case, the Plan provides that the Plan Administrator has discretionary authority to determine eligibility for benefits; therefore, the Court reviews the Plan Administrator's decision for abuse of discretion. *Perez v. Aetna Life Ins. Co.,* 150 F.3d

550, 556-58 (6th Cir. 1998). "The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (quoting *McDonald v. Western Southern Life Ins.*, 347 F.3d 161, 169 (6th Cir.2003)). "When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McDonald*, 347 F.3d at 169 (*quoting Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir.2000)). An administrator's decision will be upheld "'if it is the result of a deliberate reasoned process and if it is supported by substantial evidence.'" *Evans v. Unumprovident Corp.*, 434 F.3d 866, 876 (6th Cir.2006) (*quoting Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir.1991)).

Yet, the arbitrary and capricious standard does not make Courts "rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence-no matter how obscure or untrustworthy-to support a denial of a claim for ERISA benefits." *McDonald*, 347 F.3d at 172. The Court is obligated to make a review of both the quality and the quantity of the medical evidence and the opinions on both sides of the issues. *Id.* "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir.2002).

"[A] conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." *Evans*, 434 F.3d at 876. However, that finding "does not displace the arbitrary and capricious standard of review; rather, it is a factor that [the Court] consider[s] when determining whether the administrator's decision to deny benefits was arbitrary and capricious." *Id.*

### III. Additional evidence

The Sixth Circuit has determined that the review of an administrator's determination of benefits under an ERISA plan must be confined to the record that was before the administrator at the time of the decision. *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir. 1990). The Court in *Perry* explained that if federal courts received and considered evidence not presented to administrators concerning an employee's entitlement to benefits, their role would become that of "substitute plan administrator." *Id.* This was a role not intended by Congress when it enacted ERISA. *Id.* In addition, the Court noted that "[i]f district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection than Congress intended." *Id.* at 967. "This limitation applies to both an 'arbitrary and capricious' or a *de novo* standard of review." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).

District courts need not order additional inquiry after closure of the administrative record, absent evidence of a plan administrator's bias or bad faith in the record. *See Storms v. Aetna Life Ins. Co.*, 156 Fed.Appx. 756, 759 (6th Cir. 2005). Also, where a plan

administrator has denied a disability claim, a remand to the administrator to consider new contrary evidence after the administrative decision is unwarranted. *See Seiser v. UNUM Provident Corp.,* 135 Fed.Appx. 794, 799 (6th Cir. 2005). Further, this is not a case where the plaintiff requested and/or was given an extension of time to supplement the record with additional medical documentation. See *Hartzog v. Raytheon Engineer& Construction, Inc.*, 3:00-cv-503 (E.D. Tenn. filed Sept. 5, 2000). The Court may consider evidence outside the administrative record only if it is offered to support a procedural challenge, such as a lack of due process afforded by the administrator or bias on its part. *Wilkins v. Bapist Healthcare Sys. Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

The Court finds no reason to open the record or remand the case for additional review. Accordingly, since the supplemental medical documentation was not before the administrator when the decision in this case was made, the additional documentation cannot be considered by the Court in its review of the administrative record and the administrator's decision.

### IV. <u>Analysis</u>

The issue in this case is not whether there is evidence that Huffaker is suffering from fibromyalgia, chronic fatigue syndrome, depression, or otherwise, but rather whether MetLife's decision to deny long-term disability benefits was supported by a reasonable explanation. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). There is no dispute that treating medical providers reported that Huffaker suffered from fibromyalgia

14

as well as other medical conditions.  Further, a portion of Huffaker's doctors felt that she probably suffered from fibromyalgia and/or other medical conditions. However, these facts in isolation do not lead to the conclusion that Huffaker is therefore unable to perform the duties of an occupation.  *See Storms v. Aetna Life Ins. Co.*, 156 Fed.Appx. 756, 758 (6th Cir. 2005).  Indeed, the Court recognizes "that a diagnoses of fibromyalgia does not equate to a finding of disability."  *Conrad v. Continental Cas. Co.*, 232 F.Supp.2d 600, 264 (E.D.N.C. 2002).

In determining whether disability benefits should be awarded, conclusions as to a limiting function related to work generally must be supported by some type of objective evidence.  *See Storms*, 156 Fed.Appx. at 758*; see also Freeze v. Jefferson Pilot Financial Ins. Co.*, No. 1:05-cv-413, 2006 WL 222825, at * 5 (W.D.Mich. Jan. 30, 2006).  It is not unreasonable for a plan administrator to seek a medical or psychiatric explanation tying the conclusion that the claimant is disabled to some medical finding that supports it.  *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 382 (6th Cir.1996) (holding that "[i]n the absence of any definite anatomic explanations of plaintiff's symptoms, we cannot find that the administrator's decision to deny benefits was not arbitrary and capricious"); *see also Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 n. 6 (7th Cir.1994) (finding that a claim for benefits based on psychiatric disability "require[s] objective psychiatric evidence linking [the] symptoms to a psychiatric disorder that is totally disabling").  "While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."  *Boardman v. Prudential Ins. Co. of*

*Am.*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003).

In the instant matter, the record contains little or no evidence of an abnormal physical examination. For example, there is little or no evidence of abnormal range of motion, muscle weakness, swelling of the joints or muscles, atrophy of the muscles, edema, abnormal blood chemistry, abnormal body posture and movement, abnormal reflexes, or abnormal nerve conduction studies. Further, the record reflects "very, very mild rheumatologic testing, which would basically be considered the upper limits of normal." Although not controlling, the Court notes the denial of Social Security disability benefits on the basis that the plaintiff was not disabled within the meaning of the Social Security Act. Further, the Court considers the gloss of opinions from three independent medical examiners with respect to plaintiff and/or plaintiff's complete medical file, which indicates no impaired work function entitling disability benefits. The Court is cognizant that all physicians note Huffaker's complaints of pain, which often evade the detection by objective means; that Huffaker is deemed subject to lapses in concentration; and that there are findings of a psychological element to her condition. However, the evidence in the record does not establish that the plan administrator's decision was arbitrary and capricious when finding no functional limitation that would preclude the plaintiff's ability to perform in material duties of a medium exertion level job. Accordingly, a conclusion that the evidence submitted did not establish that the plaintiff could not perform her work was "rational in light of the plan's provisions." *Smith v. Ameritech*, 129 F.3d, 857, 863 (6th Cir. 1997) (*quoting Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).

Although Dr. Bozeman and Ms. Ferris opined that plaintiff was totally disabled, MetLife's reliance on contrary medical opinions does not make its decision arbitrary or capricious. *See Best v. Nissan Motor Corp.*, 973 F.Supp. 770, 777 (*citing Taft v. The Equitable Life Assurance Soc., 9 F.3d 1469, 1473-74 (9th Cir. 1993) ("In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion.")*; Sandoval v. Aetna Life & Causalty Ins.*, 967 F.2d 377, 382 (10th Cir. 1992).

Further, the fact that Dr. Bozeman is Huffaker's treating physician does not mean his opinion should be given greater weight or deference. "A treating physician's opinion is not entitled to greater weight in the ERISA context." *Jackson v. Metropolitan Life; Lockheed Martin Energy Systems, Inc.*, 24 Fed.Appx. 290, 293 (6th Cir. 2001). "[T]he 'treating physician rule' ... no longer applies in the ERISA context." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 293 (6th Cir.2005).[2] In addition, the mere fact that a plan administrator accepts an independent medical reviewer's opinion over that of a plaintiff's treating physician is not proof of arbitrary and capricious conduct. *Voight v. Metropolitan Life Ins. Co.*, 28 F.Supp.2d 569, 580 (C.D.Cal. 1998); *see Sweatman v. Commerical Union Ins. Co.*, 39 F.3d 594, 602 (5th Cir. 1994) (upholding a benefits denial decision based upon

---

[2]The plaintiff cites and alludes to cases for the proposition that a treating physician's opinion should be given greater deference. Along those lines, the Court notes that the Sixth Circuit has assessed the conflicting opinions of treating and non-treating sources from a somewhat different perspective in *Kalish v. Liberty Mutual*, accepting the argument "that greater deference should be accorded to the opinion of [a treating physician], not because he was Kalish's treating physician, but because [he] actually conducted physical examinations of Kalish while [the medical consultant] reviewed only Kalish's medical records." 419 F.3d at 509. However, that distinction, although relevant, is not controlling. *See Bauer v. Metropolitan Life Ins. Co.*, 397 F.Supp2d 856, 865 (E.D. Mich Oct. 25, 2005).

17

the medical consultants' opinions that were contrary to those of plaintiff's treating physician); *Best*, 973 F.Supp. at 777 (stating that it was not an abuse of discretion to rely on consistent opinions of two independent medical reviewers contrary to opinion of treating physician.); *Turpin v. Metropolitan Life Ins. Co.; Lockheed Martin Energy Systems, Inc.* 3:00-cv-667 (E.D.Tenn. filed December 4, 2005).

Although the plaintiff debates the veracity of Dr. Uzzle's physical examination, the medical review and conclusions by Dr. Uzzle, Dr. DeSantis, and Dr. Ewald, which cover medical specialities of orthopedics, physical and rehabilitation medicine, and rheumatology, are supported by the record. The physicians essentially concluded that besides Huffaker's subjective, self-serving statements, there was nothing in the record to support a conclusion that Huffaker was unable to perform work duties. Further, in review of all the treatment notes and documentation of the various treating physicians, the record does not solidly reflect a diagnosis and finding of disability. There is notable confusion among the physicians as to plaintiff's subjective complaints amid essentially normal physical examinations and normal results from testing. In one instance, Dr. Bozeman seems to test his conclusion as indicated when he reported:

> She did have point tenderness almost everywhere I touched her. When I listened to her, I pressed hard with the stethoscope to see if I could elicit any pain over her left rib area where she stated it hurt. She did not react at all to it but then when I pressed there just with my fingers, she did have discomfort.

Further, Dr. Bozeman's treatment notes dated December 30, 2004 indicate that Huffaker stated that although she did not believe she could work, she was willing to try to work if she lost her disability. Dr. Bozeman did write the plaintiff a note to return to work on a limited

18

basis; however, there is no indication that plaintiff did in fact attempt to return to employment.

Although the plaintiff claims that the medical consultants "virtually ignored" her anxiety and depression, the record reflects that Dr. Greenwood did not assign any limiting restriction. Additionally, it appears that much of plaintiff's situational stress and anxiety related to her employment and short term disability claim.

Also, plaintiff briefly contends that a conflict of interest exists because defendant has the discretion to determine her eligibility for benefits that are payable by it. While this inherent conflict of interest is a factor to be considered in the Court's analysis, *see Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir.2000), there is no evidence to show that a conflict of interest played any part in the denial of benefits in this case. *See Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir.2005) (finding that plaintiff's conclusory allegations were insufficient to show bias by the reviewing physician retained by the disability insurer). Thus, the mere possibility of a conflict of interest, without more, does not alter the conclusion that defendant's determination was rational, was based on the evidence, and, thus was not arbitrary or capricious.

In sum, although evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for a administrator's decision denying benefits in light of the plan's provisions, then the decision was not arbitrary or capricious. *Williams v. Int'l Paper*

*Co.*, 227 F.3d 706, 712 (6th Cir.2000).  While plaintiff points to information favorable to a determination finding disability, the fact remains that the denial can be reasonably explained and supported by the evidence in the record.  This Court cannot substitute its judgment for that of a plan administrator, *Brown v. National City Corp.*, 974 F.Supp. 1037, 1041 (W.D.Ky. 1997), and application of the arbitrary and capricious standard is to avoid "excessive judicial interference with plan administration."  *Daniel v. Eaton*, 839 F.2d 263, 267 (6th Cir. 1988).  The denial of benefits was not irrational or without reasoned explanation.  Rather, it is supported by the record and is hereby affirmed.

## V. Conclusion

For the reasons hereinabove set forth, defendants' motion for judgment as a matter of law [Doc. 18] is **GRANTED**; plaintiff's motion for judgment on the pleadings [Doc. 25] is **DENIED**; defendants' cross motion for judgment on the pleadings [Doc. 28] is **GRANTED**; and this case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

        **ENTER:**

        s/Thomas W. Phillips
        UNITED STATES DISTRICT JUDGE